# EXHIBIT 14

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into by and between the United States of America, acting through the United States Department of Justice and the United States Small Business Administration, ("SBA"), (collectively, the "United States"); Institute for Policy Studies ("IPS"); and TZAC, Inc. ("Relator") (hereinafter collectively referred to as "the Parties"), through their authorized representatives.

## RECITALS

A.      IPS is a not-for-profit corporation located at 1301 Connecticut Ave NW #600, Washington, DC 20036.   IPS conducts research to produce publications and to educate the public on matters of public policy.   IPS works in partnership with social movement and coalition groups on policy initiatives.   From at least January 2021 until October 2021, IPS maintained a satellite office in Jamaica Plain, Massachusetts.

B.      On August 16, 2022, TZAC, Inc. filed a qui tam action in the United States District Court for the District of Massachusetts captioned *United States ex rel. TZAC, Inc. v. Institute for Policy Studies*, pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Civil Action").

C.      The SBA is an independent agency of the United States government that provides aid, counsel, and assistance to small businesses and entrepreneurs.   The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Section 1102, vested the SBA with the responsibility of managing the PPP, under the SBA's 7(a) Loan Program.   The PPP is intended to provide economic relief to small businesses nationwide adversely impacted by COVID-19.

D.      An eligible entity for a Second Draw PPP loan does not include "any business concern or entity primarily engaged in political or lobbying activities, which shall include any

1

entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents." 15 U.S.C. § 636.

  E. To apply for Second Draw PPP funding, a business or entity had to certify that it met the requirements of the program, including that it was not "primarily engaged in political or lobbying activities, including any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents." SBA Form 2483-SD (1/21).

  F. The United States contends that IPS was ineligible for a Second Draw PPP loan because IPS is "primarily engaged in political or lobbying activities, [and is] ... organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents." The United States contends it has common law claims against IPS, specifically, for payment by mistake and unjust enrichment, arising from IPS' certification on its application for a Second Draw PPP loan, and its receipt of funds from a Second Draw PPP loan.

  G. IPS admits, acknowledges, and accepts its responsibility for the following facts:

  (a) On or around, February 1, 2021, IPS described itself on its website as "a progressive think tank dedicated to building a more equitable, ecologically sustainable, and peaceful society." IPS further stated on its website that "[i]n partnership with dynamic social movements, we turn transformative policy ideas into action."

  (b) IPS has described itself as a "think thank" in various sections of its website, on LinkedIn, and in various public documents, including reports and press releases.

  (c) Per its corporate bylaws, "The purpose of IPS is to conduct research to produce

publications, and to educate the public on important matters of public policy."

(d) Among many other objectives, IPS' Strategic Plan for 2021-2022 included "leveraging public scholarship for social movements with progressives in Congress."

(e) On or around February 11, 2021, IPS submitted an application for a Second Draw PPP loan. In its application, IPS certified that it was "not a business concern or entity primarily engaged in political or lobbying activities, including any entity that is organized for research or for engaging in advocacy in areas such as public policy or political strategy or otherwise describes itself as a think tank in any public documents."

(f) In connection with its application, IPS received a Second Draw PPP loan, loan number 8218398404, in the amount of $481,000. SBA forgave the full value of IPS' Second Draw PPP loan, and IPS' interest in the amount of $5,731.92. SBA covered the Lender Fee for this loan in the amount of $14,430.

H. The foregoing conduct described in paragraphs (F) and (G) are hereinafter referred to as the "Covered Conduct." With the exception of the facts described in the Covered Conduct, IPS expressly denies the allegations of the Relator as set forth in the Civil Action.

In consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree, and covenant as follows:

## TERMS AND CONDITIONS

1. IPS shall pay to the United States $501,161.92, the entirety of which is restitution, plus interest at a rate of 1% per annum from April 6, 2023 and continuing through the date of payment ("Settlement Amount"), no later than thirty (30) days after the Effective date of this Agreement. IPS will pay the Settlement Amount by electronic funds transfer pursuant to written instruction to be provided by the United States Attorney's Office.

2. Conditioned upon the United States receiving the Settlement Amount and as soon as feasible after receipt, the United States shall pay $50,116.19 plus a pro rata share of the accrued interest at the rate set forth above to Relator by electronic funds transfer ("Relator's Share").

3. Within thirty (30) days of the Effective Date of this agreement, IPS shall pay to Relator $1,800.18 for expenses and attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d). Immediately upon execution of this agreement, Relator shall provide wire instructions to IPS in order to effectuate this payment.

4. Subject to the exceptions in Paragraph 5 (concerning reserved claims) below, and upon the United States' receipt of the Settlement Amount, the United States releases IPS from any civil monetary claim the United States has for the Covered Conduct under the common law theories of payment by mistake and unjust enrichment.

5. Notwithstanding the release given in Paragraph 4 of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

    a. Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

    b. Any liability arising under the False Claims Act, 31 U.S.C. §§ 3729-3733;

    c. Any criminal liability;

    d. Except as explicitly stated in this Agreement, any administrative liability or enforcement right, or any administrative remedy, including the suspension and debarment rights of any federal agency;

    e. Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

   f. Any liability based upon obligations created by this Agreement; and

   g. Any liability of individuals.

6. Relator and its heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B). Conditioned upon Relator's receipt of the Relator's Share, Relator and its heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Action or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement and/or the Civil Action.

7. Conditioned upon its receipt of the payment from IPS described in Paragraph 3, Relator, for itself and its heirs, successors, attorneys, agents, and assigns, releases IPS from any civil monetary claim the relator has on behalf of the United States for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733, or under 31 U.S.C. § 3730(d) for expenses or attorneys' fees and costs.

8. IPS waives and shall not assert any defenses it may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

9. IPS fully and finally releases the United States and its agencies, officers, agents, employees, and servants from any claims (including for attorneys' fees, costs, and expenses of every kind and however denominated) that IPS has asserted, could have asserted, or may assert

5

in the future against the United States or its agencies, officers, agents, employees, or servants, related to the Covered Conduct and the United States' investigation and prosecution thereof.

10. IPS fully and finally releases the Relator from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that IPS has asserted, could have asserted, or may assert in the future against the Relator, related to the Covered Conduct and the Relator's investigation and prosecution thereof.

11. IPS agrees to the following:

    a. <u>Unallowable Costs Defined</u>: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of IPS, and its present or former officers, directors, employees, shareholders, and agents in connection with:

      (1) the matters covered by this Agreement;

      (2) the United States' audit(s) and civil and any criminal investigation(s) of the matters covered by this Agreement;

      (3) IPS's investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and any criminal investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

      (4) the negotiation and performance of this Agreement; and

      (5) the payment IPS makes to the United States and the Relator pursuant to this Agreement,

are unallowable costs for government contracting purposes (hereinafter referred to as Unallowable Costs).

b. <u>Future Treatment of Unallowable Costs</u>: Unallowable Costs will be separately determined and accounted for by IPS, and IPS shall not charge such Unallowable Costs directly or indirectly to any contract with the United States.

c. <u>Treatment of Unallowable Costs Previously Submitted for Payment</u>: Within 90 days of the Effective Date of this Agreement, IPS shall identify and repay by adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought by IPS or any of its subsidiaries or affiliates from the United States. IPS agrees that the United States, at a minimum, shall be entitled to recoup from IPS any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted requests for payment. The United States, including the Department of Justice and/or the affected agencies, reserves its rights to audit, examine, or re-examine IPS's books and records and to disagree with any calculations submitted by IPS or any of its subsidiaries or affiliates regarding any Unallowable Costs included in payments previously sought by IPS, or the effect of any such Unallowable Costs on the amount of such payments.

12. IPS agrees to cooperate fully and truthfully with the United States' investigation of individuals and entities not released in this Agreement. Upon reasonable notice, IPS shall encourage, and agrees not to impair, the cooperation of its directors, officers, and employees, and shall use its best efforts to make available, and encourage, the cooperation of former directors, officers, and employees for interviews and testimony, consistent with the rights and privileges of such individuals. IPS further agrees to furnish to the United States, upon request, complete and unredacted copies of all non-privileged documents, reports, memoranda of interviews, and records in its possession, custody, or control concerning any investigation of the Covered

Conduct that it has undertaken, or that has been performed by another on its behalf.

13. This Agreement is intended to be for the benefit of the Parties only.

14. Upon receipt of the payments described in Paragraphs 1 and 3, above, the United States and the Relator shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal. The Joint Stipulation of Dismissal shall state that: (1) claims for the allegations described in the Covered Conduct are dismissed with prejudice to the United States; (2) all other claims in the Civil Action, including claims under 31 U.S.C. §§ 3729-3733, shall be dismissed without prejudice to the United States; and (3) all claims in the Civil Action shall be dismissed with prejudice as to the Relator.

15. Subject to Paragraph 3, each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

16. Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

17. This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the District of Massachusetts. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

18. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

19. The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

20. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

21. This Agreement is binding on IPS's successors, transferees, heirs, and assigns.

22. This Agreement is binding on Relator's successors, transferees, heirs, and assigns.

23. All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

24. This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

SIGNATURES TO FOLLOW ON NEXT PAGE

THE UNITED STATES OF AMERICA

DATED: 6/22/2023        BY: _____
                              JULIEN MUNDELE (Digitally signed by JULIEN MUNDELE, Date: 2023.06.22 16:47:07 -04'00')
                              JESSICA J. WEBER
                              JULIEN M. MUNDELE
                              Assistant U.S. Attorneys
                              United States Attorney's Office
                              District of Massachusetts

DATED: 6/22/2023        BY: _____
                              Eric S. Benderson (Digitally signed by Eric S. Benderson, Date: 2023.06.22 13:56:10 -04'00')
                              ERIC BENDERSON
                              Associate General Counsel for Litigation and Claims
                              Small Business Administration

10

TZAC, INC.

DATED: 6/5/2023    BY: _____
                        TZAC, INC.


DATED: 6/5/2023    BY: _____
                        DAVID ABRAMS
                        *Counsel for TZAC, Inc.*

11

<u>INSTITUTE FOR POLICY STUDIES</u>

DATED: 6/9/2023        BY: _____
                           JOHN CAVANAGH
                           Senior Advisor
                           Institute for Policy Studies


DATED: 6/5/2023        BY: _____
                           MICHAEL SCHEININGER
                           GAVIN BOSCH
                           JILLIAN FEIRSON
                           Covington & Burling LLP
                           *Counsel for Institute for Policy Studies*

12